### UNITED STATES DISTRICT COURT
### NORTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| ANGIE BOUDREAUX, an individual, on behalf of herself and all others similarly situated,<br><br>        Plaintiff,<br><br>vs.<br><br>SYSTEMS EAST, INC.,<br><br>        Defendant. | Case No.:  5:23-CV-1498 (DNH/ML)<br><br>**CLASS ACTION COMPLAINT**<br><br>DEMAND FOR JURY TRIAL |

Plaintiff Angie Boudreaux ("Plaintiff") brings this Class Action Complaint against Systems East, Inc. ("Systems East" or "Defendant"), on behalf of herself and all others similarly situated, and alleges, upon personal knowledge as to her own actions and her counsels' investigations, and upon information and belief as to all other matters, as follows:

### I. INTRODUCTION

1.     Systems East, Inc. is a software company that provides e-Payment solutions and online payment processing solutions through its cloud-based collections and digital bill payment products.[1] Systems East is also the parent company of a product called "Xpress Pay" through which it offers customers the ability to begin accepting electronic payments.[2]

2.     On November 16, 2023, Systems East notified its customers and various state Attorneys General about a widespread data breach that occurred on August 25, 2023.[3] Systems

---

[1] *See* https://www.systemseast.com/about/ (last visited November 24, 2023).

[2] *See* https://www.systemseast.com/solutions/electronic-payments/ (last visited November 24, 2023).

[3] *See* https://apps.web.maine.gov/online/aeviewer/ME/40/e73ef83d-a467-48f5-835f-167aac9bc315.shtml (last visited November 24, 2023).

East did not discover this breach until October 27, 2023.[4]

3.      On August 25, 2023, an unknown and unauthorized individual or individuals accessed Defendant's computer network and was able to steal an entire database that contained the names and payment card information of approximately 209,328 customers (the "Data Breach").[5] Indeed this criminal obtained everything they needed to illegally use Defendant's customers' credit cards to make fraudulent purchases, and to steal the customers' identities as shown by the numerous instances of fraud Plaintiff has already suffered as a direct result of the Data Breach.

4.      Not only did the hacker(s) steal this personally identifiable information ("PII" or "Private Information"), but Plaintiff was also notified that her information was found on the Dark Web and she has suffered numerous instances of fraud following the Data Breach. This means that the Data Breach was successful, that the hacker(s) were able to access the unencrypted[6] information, and that the hacker(s) were then able to offer for sale the unencrypted, unredacted stolen PII to criminals. Because of Defendant's breach, customers' and website users' PII is still available on the Dark Web for criminals to access and abuse.

5.      This PII was compromised due to Defendant's negligent and/or careless acts and omissions and the failure to protect customers' data. In addition to its failure to prevent the breach, Defendant failed to detect the breach for more than two months.

---

[4] *Id.*

[5] *Id*.

[6] It is clear that the sensitive PII stolen in the Data Breach was not encrypted as shown by the fraud Plaintiff suffered as a direct result of the Data Breach, which would not be possible had the stolen PII and payment information actually been encrypted, and because Defendant disclosed the Data Breach and reported the Data Breach to the California Attorney General which is only required in the event of a data breach wherein unencrypted information was stolen. *See* Cal. Civ. Code § 1798.82.

6.     Moreover, Defendant did not tell customers or the Attorneys General about this Data Breach until significantly after it discovered the Data Breach, on November 16, 2023.

7.     The stolen PII of the approximately 209,328 individuals who were affected by the Data Breach possesses great value to hacker(s).

8.     Plaintiff brings this action on behalf of all persons whose PII was compromised as a result of Defendant's negligent failure to: (i) adequately protect its website users' PII, (ii) warn users of its inadequate information security practices, and (iii) effectively monitor Defendant's website and e-Payment platform for security vulnerabilities and incidents.

9.     Plaintiff and similarly situated individuals who were customers of Defendant ("Class members") have suffered injury as a result of Defendant's negligent conduct. These injuries may include: (i) lost or diminished value of PII; (ii) out-of-pocket expenses associated with the prevention, detection, and recovery from identity theft, tax fraud, and/or unauthorized use of their PII; (iii) lost opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach, including but not limited to lost time, (iv) the continued and certainly an increased risk to their PII, which (a) remains available on the Dark Web for individuals to access and abuse, and (b) remains in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect the PII.

## II. PARTIES

10.    Plaintiff Angie Boudreaux is a citizen of Lafayette, Louisiana. Plaintiff Boudreaux utilized Defendant's e-Payment services through its "Xpress Pay" platform. She received Defendant's untitled notice of the data breach, dated November 16, 2023, on or about that date.

3

11.    Defendant Systems East, Inc. is a New York Domestic Business Corporation with its principal place of business located at 50 Clinton Avenue, Cortland, New York 13045. During the class period, Defendant operated in New York and Louisiana through its website.

### III. JURISDICTION AND VENUE

12.    This Court has subject matter jurisdiction over this action under 28 U.S.C. § 1332(d) because this is a class action wherein the amount of controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs, there are more than 100 members in the proposed class, and at least one member of the class is a citizen of a state different from Defendant. Moreover, Plaintiff Boudreaux is a citizen of Louisiana and therefore diverse from Defendant, which is headquartered and incorporated in New York.

13.    This Court has personal jurisdiction over Defendant because Systems East, Inc. is headquartered and incorporated in New York and conducts business in the state.

14.    Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to these claims occurred in, were directed to, and/or emanated from this District.

### IV. FACTUAL ALLEGATIONS

#### *Background*

15.    Defendant Systems East, Inc. is a software company that provides e-Payment solutions and online payment processing services.[7] As part of its business practices, Defendant requires the users of its software, such as Plaintiff, to provide them with their Private Information including but not limited to their names, addresses, email addresses, and payment card information which includes all forms of PCI such as credit cards, debit cards, and more. On

---

[7] *See supra*, at Footnote No. 1.

4

information and belief, Defendant also stores this sensitive information in its computer network for extend periods of time as shown by the hacker(s) being able to steal the sensitive PII and payment information of approximately 209,328 individuals in the Data Breach.

16.     In addition to requiring that its customers and software users provide sensitive PII and payment information, Defendant represents that it "[p]rotects [customers' and website users'] information using the same enterprise level security as major banks."[8] Indeed, Defendant markets itself as a "secure and flexible e-Payment solution" on its website which is designed to entice its customers and users to trust that Defendant implements proper data security policies and procedures when it clearly does not.[9]

17.     Defendant also promises via its Xpress-Pay website that:

> If, for your convenience, you elect to create an Xpress-pay Digital Wallet Account to expedite future payments, this information (excluding the CVV) is encrypted and stored in secure servers certified at Level One of the Payment Card Industry Data Security Standard (PCI DSS), the highest level of certification available. If you do not explicitly instruct us to retain your credit/debit card information for future use, this payment information is erased immediately upon completion of the transaction, whether or not the transaction is successful.[10]

18.     Clearly, Defendant has failed to implement the security features it promises its customers and e-Payment platform users.

19.     The PCI DSS (Payment Card Industry Data Security Standard) compliance is a requirement for businesses that store, process, or transmit payment card data. The PCI DSS defines measures for ensuring data protection and consistent security processes and procedures around online financial transactions. Businesses that fail to maintain PCI DSS compliance are

---

[8] *See* https://www.systemseast.com/ (last visited November 24, 2023).
[9] *Id.*
[10] *See* https://info.xpress-pay.com/privacy-policy/ (last visited November 24, 2023).

subject to steep fines and penalties.

20.     As formulated by the PCI Security Standards Council, the mandates of PCI DSS compliance include, in part: developing and maintaining a security policy that covers all aspects of the business; installing firewalls to protect data; encrypting cardholder data that is transmitted over public networks; and using anti-virus software and updating it regularly.[11]

21.     To make payments using Defendant's "Xpress-Pay" software/website, customers and users can either create an account or check out as a guest. Either choice requires, at a minimum, that the customer enter the following PII onto the website:

- First and Last Name;

- Payee's Full Billing Address;

- Phone Number;

- Email;

- Credit/Debit Card Type;

- Full Credit/Debit Card Number;

- Credit/Debit Card Security Code or CSV Number; and

- Credit/Debit Card Expiration Date

22.     Indeed, this sensitive PII and payment information is all that hackers would need to commit fraudulent and criminal acts against the individuals affected by the Data Breach.

***The Data Breach***

23.     On or about November 16, 2023, Defendant sent customers an innocuous and untitled Notice of Data Security Incident.[12] In its untitled letter, Defendant informed the

---

[11]  *See* PCI Security Standards Council, *available at*: https://www.pcisecuritystandards.org/ (last visited November 24, 2023).
[12] *See supra*, at Footnote No. 3.

recipients of the notice that:

**What Happened and What Information Was Involved?** On August 25, 2023, an unknown individual temporarily accessed certain systems on our computer network, which was identified and stopped the same day. In response, we undertook a review of what occurred and identified that an  unknown individual copied an encrypted database file that contained your name and payment card information. We cannot confirm whether the unknown individual could decrypt that information. Please note, the database file did  not contain additional information normally required to process a payment card transaction, including address or contact information, card verification value or security code, or magnetic stripe data.

**What We Are Doing.** We notified the payment card providers (Visa, Mastercard, American Express, and Discover) about this matter so they could take steps to monitor your payment card information. We are also notifying you about this matter so you can take steps to monitor your payment card information. Additionally, we are evaluating our technical security measures and policies and have implemented enhancements to mitigate the risk of a matter like this reoccurring.

**What You Can Do.** We encourage you to remain vigilant against incidents of identity theft and fraud by reviewing your account statements and monitoring your free credit reports for suspicious activity and to detect errors. You may also review the "Steps You Can Take To Protect Personal Information" section of this letter to learn more about free resources that are available to assist you with protecting your information. [13]

24.    On that same day, November 16, 2023, Defendant's Director of Operations, Peter Rogati, provided the same untitled Data Breach Notice to the Attorneys General of the states where affected customers reside, including Maine[14] and California.[15]

25.    Interestingly, the Data Breach notice sent to affected individuals and the Attorneys General states that law enforcement did not disclose that its customers' and website users' debit and credit cards were being offered for sale on the Dark Web nor did it notify affected

---

[13] *Id*.

[14] *See supra*, at Footnote No. 3.

[15] *See* https://oag.ca.gov/ecrime/databreach/reports/sb24-576609 (last visited November 24, 2023).

individuals of the severity of the Data Breach. Indeed, the untitled Data Breach letter does the complete opposite and instead lulls the affected individuals into a false sense of security by proclaiming that the stolen data was encrypted, that they "cannot confirm whether the unknown individual could decrypt [the stolen] information," and that affected individuals need not do anything other than "remain vigilant against incidents of identity theft and fraud by reviewing your account statements and monitoring your free credit reports for suspicious activity and to detect errors."[16]

26.    To make matters even worse, Defendant has not offered any form of credit monitoring or identity theft protection to the affected individuals.[17]

27.    Defendant's customers' and website users' information was for sale on the Dark Web and, on information and belief, is still for sale to criminals. This means that the breach was successful; unauthorized individuals accessed Defendant's customers' unencrypted, unredacted information, including but not limited to name, phone number, email address, shipping address, billing address, payment card number, security or CVV code, and expiration date, and possibly more, without alerting Defendant, then offered the stolen information for sale online where Plaintiff received a notice that her information was found on the Dark Web. There is no indication that Defendant's customers' and website users' PII was removed from the Dark Web, where it remains to this day.

### *The Data Breach was Foreseeable*

28.    In 2022, there were 1,802 data breaches, nearly eclipsing 2021's record wherein 1,862 data breaches occurred, resulting in approximately 293,927,708 sensitive records being

---

[16] *See supra*, at Footnote No. 3.
[17] *Id*.

exposed, a 68% increase from 2020.[18] The 330 reported breaches reported in 2021 exposed nearly 30 million sensitive records (28,045,658), compared to only 306 breaches that exposed nearly 10 million sensitive records (9,700,238) in 2020.[19]

29.     Furthermore, in light of recent high profile data breaches at other industry leading companies, including Microsoft (250 million records, December 2019), Wattpad (268 million records, June 2020), Facebook (267 million users, April 2020), Estee Lauder (440 million records, January 2020), Whisper (900 million records, March 2020), and Advanced Info Service (8.3 billion records, May 2020), Defendant knew or should have known that the Private Information that it collected and maintained would be targeted by cybercriminals.

30.      Indeed, cyberattacks have become so notorious that the FBI and U.S. Secret Service have issued a warning to potential targets, so they are aware of and take appropriate measures to prepare for and are able to thwart such an attack.

31.     Despite the prevalence of public announcements of data breach and data security compromises, and despite its own acknowledgment of its duties to keep Private Information confidential and secure, Defendant failed to take appropriate steps to protect the Private Information of Plaintiff and the Class from being compromised.

### *Securing PII and Preventing Breaches*

32.     In a debit or credit card purchase transaction on an e-Payment platform, card data must flow through multiple systems and parties to be processed. Specifically:

"When you use your credit card to order the book on the vendor's web site, you'll be asked

---

[18] *See* "*2021 Data Breach Annual Report*" (ITRC, Jan. 2022) *available at* https://notified.idtheftcenter.org/s/, at 6 (last visited November 27, 2023).
[19] *See* "*Data Breaches Hit Lots More People in 2022*" (Jan. 25, 2023) *available at* https://www.cnet.com/tech/services-and-software/data-breaches-hit-lots-more-people-in-2022/ (last visited November 27, 2023).

to enter your credit card information, including the expiration date, three-digital card verification value code and address.

Once you hit the submit button, a payment gateway comes into play. Its main job is to approve or deny payment requests.

The gateway transfers information between a website or smartphone and your credit card bank account.

It validates the accuracy of the payment information and uses security protocols and encryptions to make sure the transactions remain safe.

The payment gateway forwards your purchase request to your company's credit card company. This company, in turn, verifies whether there's enough money in your credit card account to pay for the book.

If so, the gateway sends the payment to the vendor."[20]

33.    There are two points in the payment process where sensitive cardholder data is at risk of being exposed or stolen: when the consumer submits their Private Information and payment card information to the e-Payment platform, and when the e-Payment platform forwards this information to the vendor. This risk is greatly increased when the e-Payment platform, like Defendant, stores consumer's Private Information and payment information on its computer systems.

34.    Encryption mitigates security weaknesses that exist when consumer data has been stored by using algorithmic schemes to transform plain text information into a non-readable format called "ciphertext." By scrambling the Private Information and payment card data the moment it is submitted, hackers who steal the data are left with useless, unreadable text in the place of payment card numbers accompanying the cardholder's personal Private Information stored in the e-Payment platform's computers. Defendant failed to implement such a simple solution, which

---

[20] *See* "*Electronic Payment Systems: Everything You Need to Know*" (July 26, 2022) *available at* https://www.avidxchange.com/blog/electronic-payment-systems-faqs-everything-you-need-to-know/ (last visited November 27, 2023).

would have protected its customers' data. Additionally, to make matters worse, Defendant stored this Private Information and payment information on its computer network further exposing its website users' PII and payment card information to risk of being stolen.

35.    The financial fraud suffered by Plaintiff and other customers demonstrates that Defendant chose not to invest in the technology to encrypt payment card data ("PCD") at point-of-sale and in storage on its computer systems to make its customers' data more secure; failed to install updates, patches, and malware protection or to install them in a timely manner to protect against a data security breach; and/or failed to provide sufficient control of employee credentials and access to computer systems to prevent a security breach and/or theft of PCD.

36.    These failures demonstrate a clear breach of the Payment Card Industry Data Security Standards (PCI DSS), which are industry-wide standards for any organization that handles PCD.

37.    A study by the Identity Theft Resource Center shows the multitude of harms caused by fraudulent use of Private Information:[21]

---

[21] *See* Jason Steele, *Credit Card Fraud and ID Theft Statistics,* CREDITCARDS.COM (June 11, 2021), https://www.creditcards.com/credit-card-news/credit-card-security-id-theft-fraud-statistics-1276/ (last visited November 27, 2023).
[https://web.archive.org/web/20200918073034/https://www.creditcards.com/credit-card-news/credit-card-security-id-theft-fraud-statistics-1276/].



38.    Plaintiff and Class members have experienced one or more of these harms as a result of the Data Breach.

39.    Furthermore, theft of Private Information is also gravely serious. Private Information is a valuable property right. Its value is axiomatic, considering the value of Big Data in corporate America and the consequences of cyber thefts include heavy prison sentences. Even this obvious risk to reward analysis illustrates beyond doubt that Private Information has considerable market value.

40.    Moreover, there may be a time lag between when harm occurs versus when it is discovered, and also between when PII or PCD is stolen and when it is used. According to the U.S. Government Accountability Office, which conducted a study regarding data breaches:

> [L]aw enforcement officials told us that in some cases, stolen data may be held for up to a year or more before being used to commit identity theft. Further, once stolen data have been sold or posted on the Web, fraudulent use of that information may continue for

years.  As a result, studies that attempt to measure the harm resulting from data breaches cannot necessarily rule out all future harm.[22]

41.    Private Information and PCD are such valuable commodities to identity thieves that once the information has been compromised, criminals often trade the information on the "cyber black-market" for years.

42.    There is a strong probability that entire batches of stolen payment card information have been dumped on the black market or are yet to be dumped on the black market, meaning Plaintiff and Class members are at an increased risk of fraud for many years into the future. Thus, Plaintiff and Class members must vigilantly monitor their financial accounts for many years to come.

43.    Plaintiff and Class members have suffered and will continue to suffer injuries as a direct result of the Data Breach. In addition to fraudulent charges and damage to their credit, many victims spent substantial time and expense relating to:

a.    Finding fraudulent charges;

b.    Canceling and reissuing cards;

c.    Purchasing credit monitoring and identity theft prevention;

d.    Addressing their inability to withdraw funds linked to compromised accounts;

e.    Removing withdrawal and purchase limits on compromised accounts;

f.    Taking trips to banks and waiting in line to obtain funds held in limited accounts;

---

[22] *See* U.S. Gov't Accountability Off., GAO 07737, "*Personal Information: Data Breaches Are Frequent, but Evidence of Resulting Identity Theft Is Limited; However, the Full Extent Is Unknown,*" at 29 (June 2007), https://www.gao.gov/assets/gao-07-737.pdf (last visited November 27, 2023).

g.  Spending time on the phone with or at the financial institution to dispute fraudulent charges;

h.  Resetting automatic billing instructions; and

i.  Paying late fees and declined payment fees imposed as a result of failed automatic payments.

44.    Plaintiff and Class members have been damaged by the compromise of their Private Information in the Data Breach.

45.    Plaintiff's and Class members' Private Information was compromised as a direct and proximate result of the Data Breach.

46.    As a direct and proximate result of the Data Breach, Plaintiff's Private Information was exfiltrated and is in the hands of identity thieves and criminals, as evidenced by the fraud perpetrated against Plaintiff and Class members.

47.    As a direct and proximate result of Defendant's conduct, Plaintiff and Class members have been placed at an immediate and continuing increased risk of harm from fraud. Plaintiff and Class members now have to take the time and effort to mitigate the actual and potential impact of the data breach on their everyday lives, including placing "freezes" and "alerts" with credit reporting agencies, contacting their financial institutions, closing, or modifying financial accounts, and closely reviewing and monitoring bank accounts and credit reports for unauthorized activity for years to come.

48.    Plaintiff and Class members may also incur out-of-pocket costs for protective measures such as credit monitoring fees, credit report fees, credit freeze fees, and similar costs directly or indirectly related to the Data Breach.

49.    Plaintiff and Class members also suffered a loss of value of their Private

Information when it was acquired by cyber thieves in the Data Breach. Numerous courts have recognized the propriety of loss of value damages in similar cases.

50.    Plaintiff and Class members were also damaged via benefit-of-the-bargain damages.  The implied contractual bargain entered into between Plaintiff and Defendant included Defendant's contractual obligation to provide adequate data security, which Defendant failed to provide. Thus, Plaintiff and Class members did not get what they paid for.

51.    Plaintiff and Class members have spent and will continue to spend significant amounts of time to monitor their financial accounts and records for misuse.

52.    Plaintiff and Class members have suffered, and continue to suffer, economic damages and other actual harm for which they are entitled to compensation, including:

a.    Trespass, damage to and theft of their personal property including Private Information;

b.    Improper disclosure of their Private Information;

c.    The present and continuing injury flowing from potential fraud and identity theft posed by customers' Private Information being placed in the hands of criminals;

d.    Damages flowing from Defendant's untimely and inadequate notification of the Data Breach;

e.    Loss of privacy suffered as a result of the Data Breach;

f.    Ascertainable losses in the form of out-of-pocket expenses and the value of their time reasonably incurred to remedy or mitigate the effects of the Data Breach;

g.    Ascertainable losses in the form of deprivation of the value of customers'

Private Information for which there is a well-established and quantifiable national and international market; and,

h.   The loss of use of and access to their account funds and costs associated with the inability to obtain money from their accounts or being limited in the amount of money customers were permitted to obtain from their accounts.

53.   The substantial delay in providing notice of the Data Breach deprived Plaintiff and Class members of the ability to promptly mitigate potential adverse consequences resulting from the Data Breach. As a result of Defendant's delay in detecting and notifying consumers of the Data Breach, the risk of fraud for Plaintiff and Class members was and has been driven even higher.

### Value of Personally Identifiable Information

54.   The PII of individuals remains of high value to criminals, as evidenced by the prices they will pay through the Dark Web. Numerous sources cite Dark Web pricing for stolen identity credentials. For example, personal information can be sold at a price ranging from $40 to $200, and bank details have a price range of $50 to $200.[23] Experian reports that a stolen credit or debit card number can sell for $5 to $110 on the dark web.[24] Criminals can also purchase access to entire company data breaches from $900 to $4,500.

55.   An active and robust legitimate marketplace for Private Information also exists. In

---

[23] *See* Anita George, "*Your personal data is for sale on the dark web. Here's how much it costs,*" DIGITAL TRENDS (Oct. 16, 2019), https://www.digitaltrends.com/computing/personal-data-sold-on-the-dark-web-how-much-it-costs/ (last visited November 27, 2023).

[24] *See* Brian Stack, "*Here's How Much Your Personal Information Is Selling for on the Dark Web,*" EXPERIAN (Dec. 6, 2017), https://www.experian.com/blogs/ask-experian/heres-how-much-your-personal-information-is-selling-for-on-the-dark-web/ (last visited November 27, 2023).

2019, the data brokering industry was worth roughly $200 billion.[25] In fact, the data marketplace is so sophisticated that consumers can actually sell their non-public information directly to a data broker who in turn aggregates the information and provides it to marketers or app developers.[26] Consumers who agree to provide their web browsing history to the Nielsen Corporation can receive up to $50.00 a year.[27]

56.     As a result of the Data Breach, Plaintiff's, and Class members' Private Information, which has an inherent market value in both legitimate and dark markets, has been damaged and diminished by its acquisition by cybercriminals. This transfer of value occurred without any consideration paid to Plaintiff or Class members for their property, resulting in an economic loss. Moreover, the Private Information is likely readily available to others, and the rarity of the Private Information has been destroyed, thereby causing additional loss of value.

57.     The fraudulent activity resulting from the Data Breach may not come to light for years and Plaintiff and Class members face a risk of fraud and identity theft as a result of the Data Breach.

58.     At all relevant times, Defendant knew, or reasonably should have known, of the importance of safeguarding the Private Information of Plaintiff and Class members, particularly given the sensitive nature of their purchases, and of the foreseeable consequences that would occur if Defendant's data security system was breached (as it had been as recently as 2020), including, specifically, the significant costs and risks that would be imposed on Plaintiff and Class members

---

[25] *See* David Lazarus, "*Column: Shadowy data brokers make the most of their invisibility cloak*," LOS ANGELES TIMES (Nov. 5, 2019), https://www.latimes.com/business/story/2019-11-05/column-data-brokers (last visited November 27, 2023).

[26] *See* Data Coup, https://datacoup.com/ (last visited November 27, 2023).

[27] *See "Frequently Asked Questions*," Nielsen Computer & Mobile Panel, https://computermobilepanel.nielsen.com/ui/US/en/faqen.html (last visited November 27, 2023).

as a result of a breach.

59.     Plaintiff and Class members now face years of constant surveillance of their financial and personal records, monitoring, and loss of rights. The Class is incurring and will continue to incur such damages in addition to any fraudulent use of their Private Information.

60.     Defendant was, or should have been, fully aware of the unique type and the significant volume of data on Defendant's storage platform, amounting to tens or hundreds of thousands of individuals' detailed, Private Information and, thus, the significant number of individuals who would be harmed by the exposure of the unencrypted data.

61.     To date, Defendant has offered no credit monitoring or identity theft services. This is wholly inadequate to protect Plaintiff and Class members from the threats they face for years to come, particularly in light of the Private Information at issue here.

62.     The injuries to Plaintiff and Class members were directly and proximately caused by Defendant's failure to implement or maintain adequate data security measures, and failure to protect the Private Information of Plaintiff and Class members.

### *Plaintiff Angie Boudreaux's Experience*

63.     Plaintiff Boudreaux was required to provide Defendant with her Private Information and PCD to access and utilize Defendant's Xpress Pay website.

64.     Plaintiff Boudreaux suffered actual injury from having her Private Information and PCD compromised and/or stolen as a result of the Data Breach.

65.     Plaintiff Boudreaux suffered actual injury and damages in paying money through and utilizing services from Defendant that she would not have utilized had Defendant disclosed that it lacked computer systems and data security practices adequate to safeguard customers' personal and financial information and had Defendant provided timely and accurate notice of the

Data Breach.

66.     Plaintiff Boudreaux suffered actual injury in the form of actual unreimbursed financial losses as a result of the fraud she suffered as a direct result of the Data Breach and damages to and diminution in the value of her personal and financial information – a form of intangible property that the Plaintiff Boudreaux entrusted to Defendant for the purpose of making payments through Defendant's website and which was compromised in, and as a result of, the Data Breach.

67.     Plaintiff Boudreaux has also suffered numerous instances of fraud as a direct result of the Data Breach. Specifically, after the Data Breach, Plaintiff Boudreaux suffered: (1) multiple fraudulent charges to her credit and debit cards and her bank account from multiple foreign companies, some of which were never reimbursed; (2) multiple fraudulent charges to her debit and credit card accounts for subscription services she never signed up for; (3) multiple notifications from her bank regarding an unauthorized third party making multiple duplicate charges to her bank account and purchasing cryptocurrency using her Coinbase account without her authorization; (4) an unauthorized third party opening an Uphold cryptocurrency account in her name and purchasing cryptocurrency multiple times using her debit and credit cards without her authorization; and (5) loss of access to her bank account, credit card account, and Coinbase account as a result of the numerous fraudulent charges to her accounts. On information and belief, Plaintiff Boudreaux believes that the unauthorized third party accessed her Coinbase account, and created an Uphold cryptocurrency account, utilizing the sensitive Private Information it acquired from the Data Breach, purchase cryptocurrency using her Private Information it acquired from the Data Breach, and then sent the purchased crypto currency to an anonymous cryptocurrency wallet; a transaction that is anonymous and largely untraceable. Indeed, this form

of fraud has become more and more prevalent throughout the recent years and is the *modus operandi* of hackers who access, and sometimes purchase, victim's cryptocurrency accounts.[28]

68.    Indeed, Plaintiff Boudreaux has suffered actual out-of-pocket and unreimbursed financial losses totaling more than $1,000.00 from the fraud she suffered as a direct result of the Data Breach.

69.    Moreover, Plaintiff Boudreaux was notified by her Norton Antivirus software that her information was found on the Dark Web and has also been forced to purchase an application that screens the numerous scam and phishing calls she has been receiving on a daily basis.

70.    Plaintiff Boudreaux suffers present and continuing injury arising from the substantially increased risk of future fraud, identity theft and misuse posed by her personal and financial information being placed in the hands of criminals who have already misused such information stolen in the Data Breach.

71.    Plaintiff Boudreaux has a continuing interest in ensuring that her Private Information, which remains in the possession of Defendant, is protected, and safeguarded from future breaches.

72.    As a result of the Data Breach, Plaintiff Boudreaux made reasonable efforts to mitigate the impact of the Data Breach, including but not limited to, researching the Data Breach; reviewing credit reports and financial account statements for any indications of actual or attempted identity theft or fraud; dealing with the fraud she suffered as a direct result of the Data Breach; and researching credit monitoring and identity theft protection services offered by Defendant. Plaintiff Boudreaux has spent more than 40 hours dealing with the Data Breach,

---

[28] *See* Justinas Baltrusaitis, "*Hacked Coinbase accounts on sale for as low as $610 on dark web*" (May 1, 2023) available at https://finbold.com/hacked-coinbase-accounts-on-sale-for-as-low-as-610-on-dark-web/ (last visited November 27, 2023).

valuable time Plaintiff Boudreaux otherwise would have spent on other activities.

73.     As a result of the Data Breach, Plaintiff Boudreaux has suffered anxiety as a result of the release of her Private Information, which she believed would be protected from unauthorized access and disclosure, including anxiety about unauthorized parties viewing, selling, and/or using her Private Information for purposes of identity crimes, fraud, and theft. Plaintiff is very concerned about identity theft and fraud, as well as the consequences of such identity theft and fraud resulting from the Data Breach.

74.     Plaintiff Boudreaux suffered actual injury from having her Private Information compromised as a result of the Data Breach including, but not limited to (a) damage to and diminution in the value of her PII, a form of property that Defendant obtained from Plaintiff Boudreaux; (b) violation of her privacy rights; (c) actual unreimbursed financial losses as a direct result of the Data Breach; (d) out-of-pocket expenses related to the purchasing of an application to screen the flood of scam and phishing calls she receives on an almost daily basis; and (e) present, imminent, and impending injury arising from the increased risk of identity theft and fraud.

75.     As a result of the Data Breach, Plaintiff Boudreaux anticipates spending considerable time and money on an ongoing basis to try to mitigate and address harms caused by the Data Breach. As a result of the Data Breach, Plaintiff Boudreaux is at a present risk and will continue to be at increased risk of identity theft and fraud for years to come.

## V. CLASS ALLEGATIONS

76.     Plaintiff brings this nationwide class action pursuant to Rule 23(b)(2), 23(b)(3), and 23(c)(4) of the Federal Rules of Civil Procedure, individually and on behalf of all members of the following class: **All individuals whose PII was compromised in the Data Breach**

announced by Systems East, Inc. on November 16, 2023 (the "Class").

77.     Excluded from the Class are the following individuals and/or entities: Defendant and its parents, subsidiaries, affiliates, officers and directors, and any entity in which Defendant have a controlling interest; all individuals who make a timely election to be excluded from this proceeding using the correct protocol for opting out; any and all federal, state or local governments, including but not limited to their departments, agencies, divisions, bureaus, boards, sections, groups, counsels and/or subdivisions; and all judges assigned to hear any aspect of this litigation, as well as their immediate family members.

78.     Plaintiff reserves the right to modify or amend the definition of the proposed Class before the Court determines whether certification is appropriate.

79.     **Numerosity**: The Class is so numerous that joinder of all members is impracticable. Defendant has identified hundreds of thousands of customers whose PII may have been improperly accessed in the Data Breach, and the Class is apparently identifiable within Defendant's records.

80.     **Commonality**: Questions of law and fact common to the Class exists and predominates over any questions affecting only individual Class members. These include:

    a.  Whether and when Defendant actually learned of the data breach and whether its response was adequate;

    b.  Whether Defendant owed a duty to the Class to exercise due care in collecting, storing, safeguarding and/or obtaining their PII and PCD;

    c.  Whether Defendant breached that duty;

    d.  Whether Defendant implemented and maintained reasonable security procedures and practices appropriate to the nature of storing Plaintiff's and Class members' PII

and PCD;

e.  Whether Defendant acted negligently in connection with the monitoring and/or protecting of Plaintiff's and Class members' PII and PCD;

f.  Whether Defendant knew or should have known that it did not employ reasonable measures to keep Plaintiff's and Class members' PII secure and prevent loss or misuse of that PII and PCD;

g.  Whether Defendant adequately addressed and fixed the vulnerabilities which permitted the data breach to occur;

h.  Whether Defendant caused Plaintiff and Class members damages;

i.  Whether Defendant violated the law by failing to promptly notify class members that their PII and PCD had been compromised;

j.  Whether Plaintiff and the other Class members are entitled to credit monitoring and other monetary relief;

81.  **Typicality**: Plaintiff's claims are typical of those of other Class members because all had their PII and PCD compromised as a result of the data breach, due to Defendant's misfeasance.

82.  **Adequacy**: Plaintiff will fairly and adequately represent and protect the interests of Class members. Plaintiff's Counsel are competent and experienced in litigating privacy-related class actions.

83.  **Superiority and Manageability**: Under 23(b)(3), a class action is superior to other available methods for the fair and efficient adjudication of this controversy since joinder of all the members of the Class is impracticable. Individual damages for any individual Class member are likely to be insufficient to justify the cost of individual litigation, so that in the

absence of class treatment, Defendant's misconduct would go unpunished. Furthermore, the adjudication of this controversy through a class action will avoid the possibility of inconsistent and potentially conflicting adjudication of the asserted claims. There will be no difficulty in the management of this action as a class action.

84.    Class certification is also appropriate under Fed. R. Civ. P. 23(a) and (b)(2) because Defendant has acted or refused to act on grounds generally applicable to the Class, so that final injunctive relief or corresponding declaratory relief is appropriate as to the Class as a whole.

85.    Likewise, particular issues under Rule 23(c)(4) are appropriate for certification because such claims present only particular, common issues, the resolution of which would advance the disposition of this matter and the parties' interests therein. Such particular issues include, but are not limited to:

a.    Whether Defendant owed a legal duty to Plaintiff and Class members to exercise due care in collecting, storing, using, and safeguarding their PII and PCD;

b.    Whether Defendant breached a legal duty to Plaintiff and Class members to exercise due care in collecting, storing, using, and safeguarding their PII and PCD;

c.    Whether Defendant failed to comply with their own policies and applicable laws, regulations, and industry standards relating to data security;

d.    Whether Defendant failed to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the information compromised in the data breach; and

e.    Whether Class members are entitled to actual damages, credit monitoring or other

injunctive relief, and/or punitive damages as a result of Defendant's wrongful

conduct.

**COUNT I**
**(Negligence)**
**(On Behalf of Plaintiff and the Class)**

86.    Plaintiff repeats and re-alleges the allegations set forth in paragraphs 1-85 and

incorporate the same as if set forth herein.

87.    Defendant solicited and gathered the Private Information, including the PCD, of

Plaintiff and Class members to facilitate e-Payment transactions.

88.    Defendant knew, or should have known, of the risks inherent in collecting Plaintiff

and Class members' Private Information and the importance of adequate security. Defendant also

knew about numerous, well-publicized payment platform and e-Payment data breaches involving

other e-Payment and similar type companies.

89.    Defendant owed duties of care to Plaintiff and Class members whose Private

Information was entrusted to it. Defendant's duties included the following:

a.    To exercise reasonable care in obtaining, retaining, securing, safeguarding,

deleting, and protecting Private Information in its possession;

b.    To exercise reasonable care in selecting its third-party vendors and monitoring and

auditing their data security practices ensuring compliance with legal and industry

standards and obligations;

c.    To protect customers' Private Information using reasonable and adequate security

procedures and systems that are compliant with the PCI DSS and consistent with

industry-standard practices;

d. To implement processes to quickly detect a data breach and to timely act on warnings about data breaches; and

e. To promptly notify Plaintiff and Class members of the data breach.

90.    By collecting this data and using it for commercial gain, Defendant had a duty of care to use reasonable means to secure and safeguard its computer property, to prevent disclosure of Private Information, and to safeguard the Private Information from theft. Defendant's duty included a responsibility to implement processes by which it could detect a breach of its security systems in a reasonably expeditious period of time and to give prompt notice to those affected in case of a data breach.

91.    Defendant's duty of care extended to ensuring that any third-party vendors it hired and that had exposure to the Private Information of Plaintiff and Class members would implement adequate measures to prevent and detect cyber intrusions.

92.    Because Defendant knew that a breach of its systems would damage thousands of its customers, including Plaintiff and Class members, it had a duty to adequately protect their Private Information.

93.    Defendant owed a duty of care not to subject Plaintiff and Class members to an unreasonable risk of harm because they were the foreseeable and probable victims of any inadequate security practices.

94.    Defendant had a duty to implement, maintain, and ensure reasonable security procedures and practices to safeguard Plaintiff's and Class members' Private Information.

95.    Defendant knew, or should have known, that its computer systems and security practices did not adequately safeguard the Private Information of Plaintiff and Class members.

96.    Defendant knew, or should have known, that the computer systems and security practices of its third-party vendors did not adequately safeguard the Private Information of Plaintiff and Class members.

97.    Defendant breached its duties of care by failing to provide fair, reasonable, or adequate computer systems and data security practices to safeguard the Private Information of Plaintiff and Class members.

98.    Defendant breached its duties of care by failing to provide prompt notice of the data breach to the persons whose Private Information was compromised.

99.    Defendant acted with reckless disregard for the security of the Private Information of Plaintiff and Class members because Defendant knew or should have known that its computer systems and data security practices, and those of its third-party vendors, were not adequate to safeguard the Private Information that that it collected, which hackers targeted in the Data Breach.

100.    Defendant acted with reckless disregard for the rights of Plaintiff and Class members by failing to provide prompt and adequate notice of the Data Breach so that they could take measures to protect themselves from damages caused by the fraudulent use the Private Information compromised in the Data Breach.

101.    Defendant had a special relationship with Plaintiff and Class members. Plaintiff's and Class members' willingness to entrust Defendant with their Private Information was predicated on the mutual understanding that Defendant would implement adequate security precautions. Moreover, Defendant was in an exclusive position to protect its systems (and the Private Information) from attack. Plaintiff and Class members relied on Defendant to protect their Private Information.

102. Defendant's own conduct also created a foreseeable risk of harm to Plaintiff and Class members and their Private Information. Defendant's misconduct included failing to:

    a. Secure its e-commerce and e-Payment website;

    b. Secure access to its servers and computer network;

    c. Audit and monitor its severs and computer network;

    d. Comply with industry standard security practices;

    e. Follow the PCI-DSS standards;

    f. Encrypt PCD at the point-of-sale, during transit, and at rest;

    g. Employ adequate network segmentation;

    h. Implement adequate system and event monitoring;

    i. Utilize modern payment systems that provided more security against intrusion;

    j. Install updates and patches in a timely manner; and

    k. Implement the systems, policies, and procedures necessary to prevent this type of data breach.

103. Defendant also had independent duties under the FTC Act and state laws that required it to reasonably safeguard Plaintiff's and Class members' Private Information and promptly notify them about the Data Breach.

104. Defendant breached the duties it owed to Plaintiff and Class members in numerous ways, including:

    a. By creating a foreseeable risk of harm through the misconduct previously described;

b. By failing to implement adequate security systems, protocols, and practices sufficient to protect their Private Information both before and after learning of the Data Breach;

c. By failing to comply with the minimum industry data security standards, including the PCI-DSS, during the period of the Data Breach, and

d. By failing to timely and accurately disclose that Plaintiff and Class members Private Information had been improperly acquired or accessed.

105.    But for Defendant's wrongful and negligent breach of the duties it owed Plaintiff and Class members, their personal and financial information either would not have been compromised or they would have been able to prevent some or all of their damages.

106.    As a direct and proximate result of Defendant's negligent conduct, Plaintiff and Class members have suffered damages and are at imminent risk of further harm.

107.    The injury and harm that Plaintiff and Class members suffered (as alleged above) was reasonably foreseeable.

108.    The injury and harm that Plaintiff and Class members suffered (as alleged above) was the direct and proximate result of Defendant's negligent conduct.

109.    Plaintiff and Class members have suffered injury and are entitled to damages in an amount to be proven at trial.

## <u>COUNT II</u>
## BREACH OF IMPLIED CONTRACT
### (On behalf of Plaintiff and All Class Members)

110.    Plaintiff repeats and re-alleges the allegations set forth in paragraphs 1-85 and incorporate the same as if set forth herein.

111.    When Plaintiff and Class members provided their Private Information to Defendant in utilizing its e-Payment services on its website, they entered into implied contracts under which Defendant agreed to protect their Private Information and timely notify them in the event of a data breach.

112.    Defendant invited its customers and users, including Plaintiff and the Class, to make payments to particular entities on its website using multiple different payment options, including but not limited to debit credit cards, in order to increase sales by making payments more convenient.

113.    An implicit part of the offer was that Defendant would safeguard their Private Information using reasonable or industry-standard means and would timely notify Plaintiff and Class members in the event of a data breach.

114.    Defendant also affirmatively represented in its Privacy Policy that it protected the Private Information of Plaintiff and Class members in several ways, as described above.

115.    Based on the implicit understanding and also on Defendant's representations, Plaintiff and Class members accepted the offers and provided Defendant with their Private Information by using their payment cards in connection with e-Payments on the Defendant website both before and during the period of the Data Breach.

116.    Defendant manifested its intent to enter into an implied contract that included a contractual obligation to reasonably protect Plaintiff's and Class members' Private Information through, among other things, its Privacy Notice.

117.    Defendant further demonstrated an intent to safeguard the Private Information of Plaintiff and Class members through its conduct. No reasonable person would provide sensitive,

non-public information to any payment platform without the implicit understanding that the platform would maintain that information as confidential.

118.    In entering into such implied contracts, Plaintiff and Class members reasonably believed and expected that Defendant's data security practices complied with relevant laws and regulations and were consistent with industry standards.

119.    Plaintiff and Class members would not have provided their Private Information to Defendant had they known that Defendant would not safeguard their Private Information as promised or provide timely notice of a data breach.

120.    Plaintiff and Class members fully performed their obligations under the implied contracts with Defendant.

121.    Defendant breached the implied contracts by failing to safeguard Plaintiff's and Class members' Private Information and failing to provide them with timely and accurate notice when their Private Information was compromised in the Data Breach.

122.    The losses and damages Plaintiff and Class members sustained (as described above) were the direct and proximate result of Defendant's breaches of its implied contracts with them.

<u>**COUNT III**</u>
**UNJUST ENRICHMENT**
**(on behalf of Plaintiff and All Class Members)**

123.    Plaintiff repeats and re-alleges the allegations set forth in paragraphs 1-85 and incorporate the same as if set forth herein.

124.    This claim is brought in the alternative to Plaintiff's claim for breach of implied contract.

125.    Defendant funds its data security measures entirely from its general revenue, including the revenue it generates as a result of the payments made by Plaintiff and Class members.

126.    As such, a portion of the revenue Defendant generated from the payments made by Plaintiff and Class members while using its e-Payment services was to be used to provide a reasonable level of data security, and the amount of the portion of each payment made that is allocated to data security is known to Defendant.

127.    Plaintiff and Class members conferred a monetary benefit on Defendant. Specifically, they provided Defendant with their Private Information in order to make payments to various entities using Defendant's e-Payment services, which, on information and belief, Defendant charged these entities a fee for the convenience of using its e-Payment services. In exchange, Defendant should have protected Plaintiff and Class members Private Information with the adequate data security they promised in their Privacy Policy.

128.    Defendant knew that Plaintiff and Class members conferred a benefit which Defendant accepted. Defendant profited from these transactions and used the Private Information of Plaintiff and Class members for business purposes.

129.    In particular, Defendant enriched itself by saving the costs it reasonably should have expended on data security measures to secure Plaintiff's and Class members' Private Information and instead directing those funds to its own profit. Instead of providing a reasonable level of security that would have prevented the hacking incident, Defendant instead calculated to increase its own profits at the expense of Plaintiff and Class members by utilizing cheaper, ineffective security measures.  Plaintiff and Class members, on the other hand, suffered as a direct and proximate result of Defendant's decision to prioritize its own profits over the requisite security.

130.    Under the principles of equity and good conscience, Defendant should not be permitted to retain the money belonging to Plaintiff and Class members, because Defendant failed

to implement appropriate data management and security measures that are mandated by industry standards.

131.    Defendant failed to secure Plaintiff's and Class members' Private Information and, therefore, did not provide full compensation for the benefit Plaintiff and Class members provided.

132.    Plaintiff and the Class have no adequate remedy at law.

133.    Under the circumstances, it would be unjust for Defendant to be permitted to retain any of the benefits that Plaintiff and Class members of the Class conferred on it.

134.    Defendant should be compelled to disgorge into a common fund or constructive trust for the benefit of Plaintiff and Class members proceeds that it unjustly received from them. In the alternative, Defendant should be compelled to refund the amounts that Plaintiff and the Class overpaid, plus attorneys' fees, costs, and interest thereon.

## COUNT IV
### (Declaratory Judgment)
### (on behalf of Plaintiff and All Class Members)

135.    Plaintiff repeats and re-alleges the allegations set forth in paragraphs 1-85 and incorporate the same as if set forth herein.

136.    Defendant owed duties of care to Plaintiff and Class members which would require it to adequately secure PII.

137.    Defendant still possesses PII regarding Plaintiff and Class members.

138.    Plaintiff and Class members' PII is still for sale on the Dark Web.

139.    Although Defendant claims they have "evaluat[ed] [its] technical security measures and policies and have implemented enhancements to mitigate the risk of a matter like this reoccurring," there is no detail on what, if any, fixes have really occurred.

140.    Plaintiff and Class members are at risk of harm due to the exposure of their PII and Defendant's failure to address the security failings that lead to such exposure.

141.    There is no reason to believe that Defendant's security measures are any more adequate than they were before the breach to meet Defendant's contractual obligations and legal duties, and there is no reason to believe Defendant has no other security vulnerabilities that have not yet been knowingly exploited.

142.    Plaintiff, therefore, seeks a declaration that (1) each Defendant's existing security measures do not comply with its explicit or implicit contractual obligations and duties of care to provide reasonable security procedures and practices appropriate to the nature of the information to protect customers' personal information, and (2) to comply with its explicit or implicit contractual obligations and duties of care, Defendant must implement and maintain reasonable security measures, including, but not limited to:

    a.  Ordering that Defendant engage third-party security auditors/penetration testers as well as internal security personnel to conduct testing, including simulated attacks, penetration tests, and audits on Defendant's systems on a periodic basis, and ordering Defendant to promptly correct any problems or issues detected by such third-party security auditors;

    b.  Ordering that Defendant engage third-party security auditors and internal personnel to run automated security monitoring;

    c.  Ordering that Defendant audit, test, and train its security personnel regarding any new or modified procedures;

d.   Ordering that Defendant user applications be segmented by, among other things, creating firewalls and access controls so that if one area is compromised, hackers cannot gain access to other portions of Defendant's systems;

e.   Ordering that Defendant conduct regular database scanning and securing checks;

f.   Ordering that Defendant routinely and continually conduct internal training and education to inform internal security personnel how to identify and contain a breach when it occurs and what to do in response to a breach;

g.   Ordering Defendant to purchase credit monitoring services for Plaintiff and Class members for a period of ten years; and

h.   Ordering Defendant to meaningfully educate its users about the threats they face as a result of the loss of their PII to third parties, as well as the steps Defendant customers must take to protect themselves.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff, on behalf of herself and Class members, request judgment against Defendant and that the Court grant the following:

A.   An Order certifying the Class, and appointing Plaintiff and her Counsel to represent the Class;

B.   Equitable relief enjoining Defendant from engaging in the wrongful conduct complained of herein pertaining to the misuse and/or disclosure of the Private Information of Plaintiff and Class members;

C.   Injunctive relief requested by Plaintiff, including but not limited to, injunctive and other equitable relief as is necessary to protect the interests of Plaintiff and Class members, including but not limited to an order;

i.    prohibiting Defendant from engaging in the wrongful and unlawful acts described herein;

ii.    requiring Defendant to protect, including through encryption, all data collected through the course of its business in accordance with all applicable regulations, industry standards, and federal, state, or local laws;

iii.    requiring Defendant to delete, destroy, and purge the personal identifying information of Plaintiff and Class members unless Defendant can provide to the Court reasonable justification for the retention and use of such information when weighed against the privacy interests of Plaintiff and Class members;

iv.    requiring Defendant to implement and maintain a comprehensive Information Security Program designed to protect the confidentiality and integrity of the Private Information of Plaintiff and Class members;

v.    prohibiting Defendant from maintaining the Private Information of Plaintiff and Class members on a cloud-based database;

vi.    requiring Defendant to engage independent third-party security auditors/penetration testers as well as internal security personnel to conduct testing, including simulated attacks, penetration tests, and audits on Defendant's systems on a periodic basis, and ordering Defendant to promptly correct any problems or issues detected by such third-party security auditors;

vii.    requiring Defendant to engage independent third-party security auditors and internal personnel to run automated security monitoring;

viii.    requiring Defendant to audit, test, and train its security personnel regarding any new or modified procedures;

ix.   requiring Defendant to segment data by, among other things, creating firewalls and access controls so that if one area of Defendant's network is compromised, hackers cannot gain access to other portions of Defendant's systems;

x.   requiring Defendant to conduct regular database scanning and securing checks;

xi.   requiring Defendant to establish an information security training program that includes at least annual information security training for all employees, with additional training to be provided as appropriate based upon the employees' respective responsibilities with handling personal identifying information, as well as protecting the personal identifying information of Plaintiff and Class members;

xii.   requiring Defendant to routinely and continually conduct internal training and education, and on an annual basis to inform internal security personnel how to identify and contain a breach when it occurs and what to do in response to a breach;

xiii.   requiring Defendant to implement a system of tests to assess its respective employees' knowledge of the education programs discussed in the preceding subparagraphs, as well as randomly and periodically testing employees' compliance with Defendant's policies, programs, and systems for protecting personal identifying information;

xiv.   requiring Defendant to implement, maintain, regularly review, and revise as necessary a threat management program designed to appropriately monitor Defendant's information networks for threats, both internal and external, and assess whether monitoring tools are appropriately configured, tested, and

updated;

xv.   requiring Defendant to meaningfully educate all Class members about the threats that they face as a result of the loss of their confidential personal identifying information to third parties, as well as the steps affected individuals must take to protect themselves;

xvi.   requiring Defendant to implement logging and monitoring programs sufficient to track traffic to and from Defendant's servers; and for a period of 10 years, appointing a qualified and independent third-party assessor to conduct a SOC 2 Type 2 attestation on an annual basis to evaluate Defendant's compliance with the terms of the Court's final judgment, to provide such report to the Court and to counsel for the class, and to report any deficiencies with compliance of the Court's final judgment;

D.   An award of damages, including actual, nominal, statutory, consequential, and punitive damages, as allowed by law in an amount to be determined;

E.   An award of attorneys' fees, costs, and litigation expenses, as allowed by law;

F.   Prejudgment interest on all amounts awarded; and

G.   Such other and further relief as this Court may deem just and proper.

## **DEMAND FOR JURY TRIAL**

Plaintiff hereby demands that this matter be tried before a jury.

Date: November 29, 2023          Respectfully Submitted,

By:    /s/ *Kate McGuire*

Benjamin Y Kaufman, Bar Roll No. 303137
Kate McGuire, Bar Roll No. 520966

**WOLF HALDENSTEIN ADLER FREEMAN & HERZ LLP**
270 Madison Avenue
New York, NY 10016
Tel: 212-545-4600
kaufman@whafh.com
mcguire@whafh.com

**CLAYEO C. ARNOLD**
**A PROFESSIONAL CORPORATION**
M. Anderson Berry*
Gregory Haroutunian*
Brandon P. Jack*
865 Howe Avenue
Sacramento, CA 95825
Tel: 916.239.4778
Fax: 916.924.1829
aberry@justice4you.com
gharoutunian@justice4you.com
bjack@justice4you.com

*Attorneys for Plaintiff*

**Pro hac vice* forthcoming